## JONES *a.* SEWARD.

*Supreme Court, First District; General Term, March, 1864.*

REMOVAL OF CAUSES.—JURISDICTION OF COURTS OF UNITED STATES.

Section 5 of the Act of Congress of March 3, 1863, relating to Habeas Corpus, and Regulating Judicial Proceedings in Certain Cases,—which provides that the defendant in any action for arrest or other trespass, &c., done under color of the authority of the President, or any law of Congress, may have such action removed into the Circuit Court of the United States,—is constitutional and valid.

Congress may give the circuit courts exclusive jurisdiction in any cases in which the Supreme Court of the United States has appellate jurisdiction.

In cases within that statute, though it is not essential, it is proper to apply to the State court in which the action is first brought, for an order for its removal, and such order should be granted.

*It seems*, that the bond should equal the sum for which the defendant has been held to bail, if at all.

Appeal from an order denying petition to remove the cause to the Circuit Court of the United States.

The action was by George W. Jones, late the Minister of the United States to New Grenada, against William H. Seward, Secretary of State of the United States, to recover damages for an alleged false imprisonment of the former by order of the latter in November, 1861. The complaint alleged that the defendant, by himself and others acting under his direction, with-

out legal process or lawful authority of any name or kind, and without cause, had the plaintiff arrested in the city of New York, and confined in Fort Lafayette for the space of four months. The defendant now moved upon petition for an order removing the cause to the Circuit Court of the United States for the Southern District of New York, under the act of Congress passed March 3, 1863, entitled "An Act Relating to Habeas Corpus, and Regulating Judicial Proceedings in Certain Cases."

The plaintiff's petition alleged—

"That he is the Secretary of State of the United States of America, and has been such since the organization of the Cabinet under the administration of Abraham Lincoln, President of said United States.

"That, as your petitioner is informed and believes, the action above entitled is brought against your petitioner for acts alleged to have been done by him as Secretary of State of the United States of America, under authority derived by him from the President of the said United States, in causing and procuring the plaintiff to be arrested and imprisoned, or for some other wrong alleged to have been done the plaintiff under such authority, during the present rebellion of the so-called Confederate States against the Government of the United States of America.

"Wherefore, he prays that on the filing of this petition this action be removed for trial to the next Circuit Court of the United States for the Southern District of New York.

"Your petitioner hereby and herewith offering good and sufficient surety for his filing in such circuit court, on the first day of its session, copies of the process and other proceedings against him in this action, and also for his appearing in such court, and entering special bail therein, if the same can legally be required.                                   WM. H. SEWARD.

"NEW YORK, June 15, 1863."

The usual verification and authentication were added.

The bond offered, upon presenting the petition, contained the following condition :

Whereas, the said action has been brought for alleged acts of injury said to have been done by the plaintiff, as Secretary of State of the United States of America, under authority derived

from the President of said United States, during the present rebellion of the so-called Confederate States against the Government of the United States of America.

"And whereas, the said William H. Seward has subscribed and verified a petition to have said action removed for trial to the Circuit Court of the United States for the Southern District of New York, under the fifth section of the Act of Congress, passed March 3d, 1863, entitled an 'Act Relating to Habeas Corpus, and Regulating Judicial Proceedings in Certain Cases.'

"Now, if the said William H. Seward shall, at the next Circuit Court of the United States for the Southern District of New York, on the first day of its session, file copies of the process and other proceedings in this action, and appear in said court and enter special bail therein, if the same were originally required in said action, then the bond or obligation to be void, otherwise to remain in full force and virtue."

In opposition to the motion, the plaintiff presented an affidavit, in which, after stating his arrest, he alleged that he was kept a prisoner in close confinement for near the space of four months, and was not allowed to send any communication to his friends or other persons with a view of seeking legal relief, and had never been informed of the cause of his arrest or the authority whereby he was arrested, although often demanded, except as shown, by the person who arrested him, the following telegram:

"The Hon. Geo. W. Jones, late Minister to Bogota, and late Senator in Congress from Iowa, leaves here this afternoon for New York Hotel, arrest him and send him to Fort Lafayette.

"W. H. SEWARD.

"Dated, WASHINGTON CITY, Dec. 19, 1861."

The motion was denied at the special term, the following opinion being rendered:

CLERKE, J.—This is an action in which the plaintiff claims damages for an alleged false imprisonment. The defendant asks for an order of this court to remove the action, and all proceedings therein, to the next Circuit Court of the United States, to be held in and for the Southern District of the State of New York. The defendant states in his petition for this order, that the action is brought for acts alleged to have been done by him

as Secretary of State for the United States of America, under authority derived by him from the President of said United States, in causing and procuring the plaintiff to be arrested or imprisoned, or for some other wrong alleged to have been done to the plaintiff under such authority, during the present rebellion of the so-called Confederate States against the government of the United States of America; and that it, therefore, comes within the act of Congress passed March 3, 1863, entitled "An Act Relating to Habeas Corpus, and Regulating Judicial Proceedings in Certain Cases," providing, in the 5th section, that if any suit has been or shall be commenced against any officer, civil or military, or any other person, for any arrest, imprisonment, trespass, or wrong done, or any act omitted to be done during the present rebellion, "by virtue or under color of any authority derived from or exercised by or under the President of the United States or any act of Congress," the defendant may remove such action into the Circuit Court of the United States for the district where the suit is brought, on complying with certain requirements stated in the act.

Of course, this act, so far as it directs the transfer of cases from the State to the Federal jurisdiction, if it has any constitutional foundation, is founded upon the third article of the Constitution of the United States, defining the extent of the judicial power delegated by the States to the Federal government, and particularly upon that part of section 1 of said article which says that "the judicial power shall extend to all cases in law and equity arising under this Constitution," &c. The defendant, in this application, maintains that the defence which he intends to set up in this action arises under the Constitution of the United States; the question to be determined being, whether the President of the United States, during a rebellion or insurrection, can arrest or imprison, or authorize another to arrest or imprison, any person not subject to military law, without any order, writ, precept, or process of some court of competent jurisdiction. Now, we assume that this question, if a question at all, would arise under the Constitution of the United States; that is, whether the President possesses this power, either in his civil capacity, or as commander-in-chief of the army and navy of the United States, can be solved only by consulting and interpreting that instrument. But, to entitle the defendant to

this order, and to give the courts of the United States jurisdiction of this action, there must be some appearance or color of substance in it. It must have some speciousness, some seeming plausibility, and must not be palpably devoid of any ground of doubt. Can it then be a question, presenting any appearance of substance or color of doubt, whether the Constitution of the United States of America has invested its chief executive officer with power to arrest or imprison, or to authorize another to arrest or imprison, any person not subject to military law, at any time, or under any exigency, without some order, writ, or precept, or process of some civil court of competent jurisdiction?

I. It cannot, of course, be pretended by the most ardent advocate of this high Presidential prerogative, that the Constitution confers it in set terms. There is, assuredly, nothing in that instrument which can be tortured into the conferring of such a power on the President in his civil capacity. And this, it appears to me, plainly disposes of the question; for, it would be asserting the grossest contradiction and strangest anomaly to say, that absolute and unlimited power, equal to any exercised by czar or sultan, can be implied from a Constitution, which avowedly gives no power to any department of the government that is not specifically set forth, except simply the consequent right to employ all legal means necessary to the execution of the power.

It may not, however, be out of place, at a time like the present, to glance at the position which some ardent advocates of Presidential unlimited prerogative, in seasons of war, rebellion, or insurrection, have endeavored to uphold. It is demanded for the President, by these advocates, from the nature and necessities of his office, in time of imminent peril to the very existence of the nation. They have ventured to say, that the authors of this Constitution, could never have intended to deny to him, in such times, all power which may be deemed indispensable for the preservation of the nation, when it is convulsed with civil commotion and threatened with the hostility of foreign powers. But if there is any thing beyond all controversy in the constitutional history of this nation, it is, that the purpose of this Constitution, and the provisions which it contains, were, for a considerable period before its adoption, anxiously and deliberately considered and thoroughly discussed

by the people at large and by their delegates in the convention; and certainly, any man proposing to confer unlimited power on any department of the government, on any pretext whatever, would not have been deemed sane.  With far-seeing caution, and the most vigorous and deliberate purpose, a constitution for a national government was framed, conferring extremely limited powers, concisely and minutely specified, at the same time providing ample means for self-preservation and the vigorous exercise of necessary authority under all emergencies.  Its authors and the people of the several States had plainly set before them, while it was under consideration, the example and experience of that nation from which their language, their laws, their social customs, and political institutions were mainly derived; and they well knew that the contest which convulsed that nation for four centuries with great alternations of triumph and defeat, vital and pre-eminent immeasurably above all others, related to the power of the crown over the personal liberty of the subject.  No doubt, before constitutional liberty was established in England, the monarch claimed, and often exercised, the power of arbitrary arrest and imprisonment; and, during the reigns of the Tudors and the Stuarts, it was held by some judges that " although the king could make no laws but by common consent in Parliament, yet, in time of war, by reason of the necessity of it to guard against dangers that often arise, he useth absolute power, so that his word is law."  Indeed, it was asserted, even in Parliament, on behalf of Elizabeth, that the Queen inherited both an enlarging and a restraining power: by her prerogative, she might set at liberty what was restrained by statute, or otherwise; and by her prerogative she might restrain what was otherwise at liberty: that the royal prerogative was not to be canvassed, nor disputed, nor examined, and did not even admit of limitation; and that absolute princes, such as the sovereigns of England, were a species of divinity. It is shown, from indisputable authority that, at least during the Tudor dynasty, " whenever there was any insurrection or public disorder, the Crown employed martial law; and it was, during that time, exercised not only over the soldiers, but over the whole people.  Any one might be punished as a rebel, or an aider or abettor of rebellion, whom a provost-marshal or lieutenant of a county, or their deputies, pleased to suspect."

Jones *a.* Seward.

This power was employed by Queen Mary in defence of the old theology, and by Queen Elizabeth in defence of the new; and after the suppression of the northern rebellion, which agitated the kingdom during a portion of the reign of the latter princess, she severely rebuked the Earl of Essex because she had not heard of his having executed any criminals by martial law. In 1552, when there was no rebellion or insurrection, King Edward granted a commission of martial law, and empowered the commissioners to execute it in such a manner as should be thought by their discretion most necessary. Hume mentions numerous other instances of the exercise of this despotic power during the reign of Elizabeth. But the more general diffusion of knowledge and the progress of civilization, produced by the revival of learning, the invention of printing, and the discovery of the western hemisphere, aroused the people to a sense of their debased condition and the vindication of their ancient rights; and her successor, James I., found his claims of Divine right and unlimited prerogative frequently disputed. It was not, however, until the reign of his perfidious and unfortunate son, that. any organized resistance was made to these claims. But, above every other invidious claim of prerogative, the power of arbitrary imprisonment was the most abhorrent to the nation. In the debates in and out of Parliament, while the committee were engaged in framing the Petition of Right, the inviolability of personal liberty was deemed paramount even to the right to life and property. " To bereave of his life a man not condemned by any legal trial," it was contended, " is so egregious an exercise of tyranny that it must at once shock the natural humanity of princes, and convey an alarm through the whole commonwealth." To confiscate a man's fortune, besides being a most atrocious act of violence, exposes the monarch so much to the imputation of avarice and rapacity, that it will seldom be attempted by any civilized government. But confinement, though a less striking, is no less severe a punishment, nor is there any spirit so erect and independent as not to be broken by the long continuance of the silent and inglorious sufferings of a prison." The power of imprisonment, therefore, it was maintained, being the most natural and potent engine of arbitrary power, it was absolutely necessary to remove it from a government which is free and legal.

These principles, on which was based the act known by the name of the Petition of Right, and which has been called the Second Great Charter of the liberties of England, were ratified by the king. He thus solemnly bound himself, among other things, never again to imprison any person, except in due course of law, and never again to subject civilians to the jurisdiction of courts-martial. How shamefully he violated this solemn covenant, and how ignominously he forfeited his life and his crown, as the righteous punishment of his perjury, is one of the saddest and gravest and most instructive records of history. His sons and successors, Charles II. and James II., particularly the lat-latter, indifferent to or forgetful of the fate of their father, did not hesitate, when the occasion seemed to require, to violate the rights of their subjects, until James, at length, intimidated by the indignation of all classes of his people, struck with terror, saved himself from the death which he deserved, by timely flight, and ended his wicked and disgraceful career as a pensioner of France. His abdication ended the long struggle forever in favor of the exemption of the basest and humblest criminal from arbitrary imprisonment under any pretence, and constitutional liberty was established in England. In order to place it on principles impossible to be misunderstood or evaded, the Convention issued their declaration of right before the crown was offered to William and Mary. On these conditions it was thankfully accepted. The principles which the Convention re-iterated were, indeed, as Macaulay says, engraven on the hearts of Englishmen during four hundred years: "That without the consent of the representatives of the nation," he continues, "no legislative act could be passed, no tax imposed, no regular soldiery kept up, that no man could be imprisoned, even for a day, by the arbitrary will of the sovereign; that no subordinate could plead the royal command as a justification for violating any right of the humblest subject, were held, both by whigs and tories, to be fundamental laws of the realm." But, despotic monarchs, under some plea of necessity, as we have seen, frequently disregarded those laws. The Declaration of Right, and the Mutiny Act passed soon after, put an end forever to any pretext on behalf of the Crown to deprive a civilian of his personal liberty, without some order, writ, precept, or process of some court of competent civil jurisdiction. It has never

been pretended, since the Declaration of Right was proclaimed, and the first Mutiny Act was passed, that any but members of the army and navy were subject to martial law or the Articles of War. It was conceded by all the counsel in Grant *a.* Gould (2 *H. Bl.*, 69), and reiterated by the court, that martial law could only be exercised in England, so far as it is authorized by the Mutiny Act and the Articles of War, which have cognizance only over the army and navy. Martial law, in the proper sense of the term, does not exist, and never has existed, in England since the Revolution. The Mutiny Act and the Articles of War, like the Military Code, &c., adopted by Congress, constitute what may more properly be called military law; and though they provide for courts-martial for the trial of military offenders, they are totally different from that kind of martial law which prevails in despotic countries, and which legally exists under constitutional governments only within the immediate theatre of war or insurrection. Undoubtedly, on some occasions the writ of habeas corpus has been suspended, but never without the consent of Parliament.

Now, is it possible that all the passages to which I have referred, in the constitutional history of England, and all the solemn and salutary warnings which they convey, were not engraven on the minds of the enlightened men who had the principal share in the formation and adoption of the present Constitution of the United States of America? Can it be supposed, for a moment, that any implied power, such as the defendant claims for the Presidential office in the present instance, would have been tolerated by those men? If they intended that a dictatorship should exist under any emergency, they would not leave it to the chief executive to assume it when he may, in his discretion, declare necessity requires it, but would at least provide that this necessity should be declared by Congress, and, as under the Constitution of ancient Rome, that the legislative power alone should select the person who should exercise it. That the President can, of his own accord, assume dictatorial power, under any pretext, is an extravagant assumption. The proposition cannot be entertained by any court; no such inquiry can arise under the Constitution of the United States; it does not reach to the proportions or stature of a question.

II. It is, however, maintained, if the President does not possess this power in his civil capacity, that he does possess it in his military capacity, as commander-in-chief of the army and navy of the United States. A commander of an army has, of course, within the sphere of his military operations against an enemy, all power necessary to insure their success. General Rosecrans had a right, I have no doubt, the other day to destroy all property which caused any obstacles to his operations against Bragg; and if he discovered any plots to mar those operations, or to give intelligence to the enemy, or to afford them any kind of aid or comfort, he would have a right to try the offenders, whether civilians or soldiers, by a court-martial. But his power does not extend beyond his lines. If a man at Cincinnati has a correspondence with Bragg, giving him intelligence of the plans of Rosecrans, the latter cannot have the offender arrested at Cincinnati, brought within his lines, and tried by a court-martial. This man is, indeed, emphatically a traitor; he is guilty of high treason against the United States of America; but he is to be tried by a civil tribunal, according to the course and practice of the established law, on a present-ment or indictment of a grand-jury. His case has not arisen in the land or naval forces, or in the militia when in actual service in time of war or public danger (see fifth amendment of the Constitution). Although it indeed affects the operations of a certain portion of the land forces, it is not a military but a civil offence. Neither can even the commander-in-chief of the army extend martial law beyond the sphere of military operations. If he possessed this power, in time of war or insurrection, over the whole extent of the nation, whether within the theatre of military operations or not, the political institutions and laws of the land would be entirely at his mercy. A whiskey insurrection in Western Pennsylvania would authorize him to abrogate the law of liberty in Massachusetts, or any other State. Martial law would extend, at the mere pleasure of the commander-in-chief, over the whole length and breadth of the land. It is beyond controversy, as we have seen, that this power does not vest in Mr. Lincoln as President; but as a military commander he can possess no greater power than if he was not President, and was merely commander-in-chief of the army and navy. Suppose the Constitution vested the command in chief

Jones *a.* Seward.

of the army and navy in some person other than the President. Could this functionary subvert the Constitution and laws of the land on the plea of military necessity? Surely not; and if he could not do it, neither can the President, unless the Constitution has empowered him to do it in his civil capacity.

The opinion referred to by the counsel of the defendant, delivered by Chief-justice TANEY, in Luther *a.* Borden (7 *How.* (U. S.), 1), so far from sanctioning, makes no question of this extension of the military power of the President. An actual insurrection existed in the State of Rhode Island, and military measures to suppress this insurrection were in operation there, by the intervention of the Federal Government, on the application (I forget which) of the Legislature or executive of that State. That commonwealth was in a condition of intestine war; and there, as in Western Georgia and in Tennessee now, the officers engaged in the military service "might lawfully arrest any one, who, from the information before them, they had reasonable grounds to believe was engaged in the insurrection."

The formidable power, for which the defendant contends, is plainly not necessary to the safety of the nation, even if the Constitution conferred it when that safety should be endangered. Within the immediate theatre of insurrection or war, the commander-in-chief and his subordinates, where the exigencies of the occasion make it necessary, we repeat, do possess it; beyond it, the ordinary course of proceedings in courts of justice will be sufficient to punish any persons who furnish information or afford any aid or comfort to the enemy, or in any way are guilty of the detestable crime of betraying their country. In sudden emergencies, caused by invasion or insurrection, the power expressly given by the Constitution and the acts of Congress to repel the one and suppress the other, are ample and effective; and it requires no exercise of arbitrary power over the sacred rights of personal liberty to accomplish this purpose. It is as manifest as the day, it is beyond all controversy, that these rights, in war or in peace, during invasion or domestic violence, even during the hideous rebellion which now confronts us, are, except in the cases which I have stated, inviolable. The President, therefore, whether in his civil capacity or as commander-in-chief of the army and navy of the United States, has, unquestionably, no power to authorize the act of which

the plaintiff complains. The ground upon which this application is made has no color of right. It cannot, in my opinion, be entertained as a question in any State or United States court. The only questions in this action worthy of consideration, and which can be entertained, do not arise under the Constitution of the United States, but are fitly within the jurisdiction of this court.

The motion is denied, without costs.

From this decision the defendant appealed.

*William C. Traphagen* and *James T. Brady*, for the appellants.

*E. R. Meade* and *William F. Allen*, for the respondents.

By the Court.*—Leonard, J.—The question is not whether the fourth section of the Act of Congress, passed March 3, 1863, affords a valid defence to the action. The true question is this, Is it in the power of Congress to give the Circuit Court jurisdiction of the case?

The Constitution extends the judicial power of the Union to all cases in law and equity arising under the Constitution, laws, and treaties of the United States.

The defence, in this case, arises under the Act of Congress, and the validity of that act, considered in the light afforded by the Constitution, will be one of the principal subjects to be determined at the trial. It has been decided that a case arises, within the meaning of the Constitution, as well when the defendant seeks protection under a law of Congress, as when a plaintiff comes into court, to demand some right conferred by law.

It has been objected that the original jurisdiction of all actions may be drawn into the Federal Courts, by similar enactments of Congress, and that the case arises, within the meaning of the Constitution, only after a trial and judgment in this court, when the action can be transferred by writ of error or appeal, and brought before the Federal courts for review.

The power of transferring causes to the United States Circuit,

---

* Present, Leonard, P. J., Sutherland and Clerke, JJ.

in a similar manner, where the question involved was of an appellate and not original jurisdiction, has long been sustained.

Chief-justice Marshall says, in the case of Osborn a. United States Bank (9 *Wheat.*, 738, 821): " We perceive no ground on which the proposition can be maintained, that Congress is incapable of giving the Circuit Courts original jurisdiction, in any case to which the appellate jurisdiction extends."

Congress has enacted that the defendant may interpose in his defence the orders, &c., of the President, and has directed the transfer of cases involving such a defence, in the manner prescribed, into the Circuit Court.

According to the statements of the defendant, such a case has arisen. We have nothing to do with the validity of the law as a defence to the action. It is sufficient for the State court that the defence involves the construction and effect of a law of Congress. The case has then arisen when the courts of the United States may have jurisdiction, if Congress so directs. If the law does not afford a constitutional or valid defence, it cannot now be doubted that the learned justices of the United States courts will so declare it; when the jurisdiction of such cases will remain in the State courts, as before the enactment of the law. It is not our duty, therefore, to assert the independence of our State sovereignty and jurisdiction, for the final construction and effect of all acts of Congress may be brought before the United States courts by the express provisions of the Constitution. The manner of taking the cause to those courts is of no consequence. The Supreme Court of the Union must be relied on to prevent its jurisdiction from being unlawfully extended by Congress. I am of the opinion, therefore, that Congress has the power to direct the transfer of such cases.

In my opinion, this application was unnecessary in order to vest the United States Circuit Court with the possession of the action; but the discussion has not been lost, inasmuch as it will be now settled, that this court will not, in this judicial district, take further cognizance of cases which have been transferred under this Act of Congress. It is very proper that an order be entered transferring the cause to the United States Circuit, as it affords the evidence, in this court, of the disposition made of it.

In arriving at my conclusions, I have consulted *Story's Com. on the Constitution* (ch. 38, §§ 903, 906, &c.); Martin a. Hunter (1

*Wheat.*, 304, 358); Cohen *a.* State of Virginia (6 *Ib.*, 264); Osborn *a.* United States Bank (9 *Ib.*, 738).

As a rule of practice, I think the court should not approve any sureties, unless the amount of the bond is equal to the sum in which the defendant in the action has been held to bail, if bail has been required in the State court. This fact should be made to appear to the satisfaction of the judge to whom the bond is presented for approval.

The decision in this case will also embrace the case of Gudeman *a.* Wool, argued at the same general term as the present case.

The order appealed from should be reversed, and the motion below should be granted without costs.

SUTHERLAND, J.—The question is not as to the constitutionality of the fourth section of the Act, declaring that the order or authority of the President, during the rebellion, shall be a defence, in all courts, to any action for any arrest, imprisonment, or act done, or omitted to be done, under or by color of the President's order, or of any law of Congress; but the question is, as to the constitutionality of the fifth section of the Act, authorizing the defendant in any such action to remove the same from the State court to the Circuit Court of the United States for the district where the suit is brought for trial, on complying with certain requirements specified in the section: that is, on entering his appearance, filing his petition stating the facts, offering good and sufficient surety, &c.

The question presented by this appeal is not as to the constitutional power of the President to order the arrest, imprisonment, &c., or as to the constitutional power of Congress to authorize the President to order the arrest, imprisonment, &c.; but the question presented by the appeal is, as to the constitutional power of Congress to give the Circuit Courts of the United States primary or original, and (as to the State courts) exclusive jurisdiction, of the trial of actions for such arrests, imprisonments, &c.

In determining the question as to the constitutionality of the fifth section of the act, we must assume, I think, that the trial of this action will involve the determination of the question as to the constitutionality of the fourth section; that Congress, in

passing the act, considered that the trials of the actions to be removed to the Circuit Courts of the United States under it, would involve the determination of the question as to the constitutionality of the fourth section, whether tried in the State or United States courts; and that Congress intended, by the fifth section, to take from the State courts and give to the Circuit Courts of the United States the right and power to determine that question.

Had Congress the constitutional power to do this? That is the question.

If Congress had the power, then the order appealed from, denying the defendant's motion to remove the action and all proceedings therein to the Circuit Court of the United States for the Southern District of New York, should be reversed, and, I think, an order made directing such removal: if Congress had not the power, then the order appealed from should be affirmed.

If no steps had been taken for the removal of the action from this court, and the action should be tried in this court, and the question as to the constitutionality of the fourth section of the Act should be decided adversely to the defendant by the Court of Appeals of this State, the Supreme Court of the United States would have final and conclusive appellate jurisdiction of the question. (*Const. U. S., art.* 3; § 25 *of the Judiciary Act*; 1 *Stat. at Large*, 85; Cohen *a.* State of Virginia, 6 *Wheat.*, 264; Miller *a.* Nicholls, 4 *Ib.*, 312.)

Cannot Congress give the Circuit Court of the United States original jurisdiction in any case to which this appellate jurisdiction extends?

In Osborn *a.* United States Bank, 9 *Wheat.*, 738, cited by Judge Leonard, Chief-justice Marshall said he could perceive no ground for saying that Congress could not.

In that case, one of the questions was, whether Congress could constitutionally confer on the Bank the right to sue and be sued "in every Circuit Court of the United States."

It was held that such a suit was a case arising under a law of the United States; consequently that it was within the judicial power of the United States, and Congress could confer upon the Circuit Court jurisdiction over it.

See also Curtis's Com. on the Jurisdiction, &c., of the Courts

of the United States, sections 12 and 13 ; the latter section con-
taining a quotation from another portion (p. 865) of the opinion
of Chief-justice Marshall in Osborn *a.* The Bank of the United
States, apparently quite pertinent to the question in this case.

I concur, then, in the conclusion of Judge Leonard, that Con-
gress had the power to direct the transfer to the Circuit Court
of the United States.

Probably an order of this court directing such transfer is not
absolutely necessary, but to make one would be in accordance
with usage in like cases ; and besides, such an order would be
the best evidence of the determination of this court that it no
longer had jurisdiction of the action.

It appearing that the defendant has complied with the re-
quirements of the Act for such transfer, the order appealed from
should be reversed, and an order made by this court for the re-
moval of the action, and all proceedings therein, to the Circuit
Court of the United States.

CLERKE, J.—I see nothing whatever in the arguments of my
brethren, or in those of other judges on the same subject, to in-
duce me to recede from the position which I have attempted
to maintain at special term.   They have all alike, in my very
humble judgment, unaccountably overlooked the only point
claiming consideration on this great constitutional subject.

According to the doctrine upheld by my brethren, we can
scarcely conceive of any act committed by any officer of the
General Government under color of any authority derived from
or under the President, which may not constitute a genuine,
veritable case, arising under the Constitution of the United
States, and which, therefore, may not rightly come within the
cognizance of their judicial power.   It is only necessary to claim
that it was committed under color of that authority, and was,
therefore, justified by the Constitution, however monstrous and
appalling the act may be, to make it, according to this doctrine,
a case arising under that Constitution.   For, of course, accord-
ing to the terms of the claim, the claimant appeals, through
this remarkable statute, to the Constitution for his justification,
and, however palpably frivolous such a claim may be, however
palpably manifest may be the conviction that the Constitution
no more sanctions such an act, than it sanctions the burning of

the Capitol, the dispersion of Congress, and the shooting, imprisonment or exile of the men of whom it is composed, yet it is claimed to present a question, and, therefore, a case arising under the great charter of Constitutional Liberty in America, the perpetrator of the outrage making that a question which is unquestionably no question; and the judicial power of the State is ousted of its legitimate jurisdiction. Thus, this extraordinary statute prescribes not only that the character, but the mere assertion, of the wrong-doer shall determine jurisdiction, and that the subject-matter, which has been always held, except in cases affecting ambassadors, other diplomatic ministers and consuls, as alone the criterion of jurisdiction, shall be excluded from consideration. Surely, if this can be done by Congress, the Government of the United States of America is not, as all men have heretofore supposed, incontestably a government of limited powers and duties, and is, if not one of unlimited powers and duties, nevertheless, of very accommodating expansibility. This is a novel and strange theory of development in America.

But, it is asserted, as the appellate power of the Supreme Court of the United States extends in certain cases to State tribunals, that this case would, after judgment, reach the Federal jurisdiction, and that, therefore, it may as well be transferred to the United States Circuit Court before judgment. Even if the Supreme Court of the United States would entertain such a case on appeal, this is no controlling reason why it should, necessarily, be transferred to the United States Circuit for adjudication in the first instance. For, the only question to be determined by us on this motion is, whether Congress has the power to transfer cases of this description to the Circuit Court of the United States; not whether, ultimately, it may reach the appellate jurisdiction of the United States Supreme Court. The Act of Congress, passed in 1789, "to establish the judicial courts of the United States," no doubt provides that a final judgment or decree in any suit in the highest court of law or equity of a State, where is drawn in question the validity of a statute of the United States, and the decision is against its validity, may be re-examined and reversed or affirmed in the Supreme Court of the United States. But, if it is too clear for controversy that the statute is an outrage on the Constitution,

if it is palpably usurpation, if it is plain to the most unlettered citizen, that the statute is an attempt to subvert all the securities which the founders of the government have provided for the preservation of personal liberty, and to invest one man with unlimited dictatorial power, and, therefore, that the appeal was palpably frivolous, I presume the court would hear no argument on such an appeal, and would forthwith affirm the judgment or dismiss the writ.  Would they, for instance, hearken to an appeal involving the validity of an Act of Congress giving the President, or any other member of the government, power, by a *coup d'état*, to extinguish the legislative branch, as Cromwell did the Long Parliament, and substitute a Barebones Legislature in its place?  Surely not; if they, too, were not struck down, and were not (if such debasement can be imagined) by force, by fear, or by corrupt appliances or selfish aspirations robbed of independence.  So that the consideration, whether the act is not palpably void, must present itself on appeal as it now presents itself to us on this motion; and, if it is palpably void, I repeat, it would not be treated on appeal as worthy of being for a moment entertained.  I still consider the defence in this case just as destitute of color as the case which I have imagined.  Whether, under the pretext of authority from the President of the United States, any one citizen, at his mere will and pleasure, without any intervention of the judicial tribunals, can incarcerate another citizen not subject to military law, in a loathsome dungeon, for many months, or for a day or an hour, cannot, under any circumstances in which the nation may be placed, be treated as a question constituting a case arising under the Constitution; and any statute which declares the contrary is palpably void.

The order at special term should be affirmed with costs.

Order reversed.